UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. 13-50047-JLV |
| | ) | |
| Plaintiff, | ) | |
| | ) | **REPORT AND** |
| vs. | ) | **RECOMMENDATION ON** |
| | ) | **DEFENDANT'S MOTION TO** |
| BRANDON HATTAWAY, | ) | **SUPPRESS** |
| | ) | [DOCKET NO. 24] |
| Defendant. | ) | |
| | ) | |
| | ) | |

## INTRODUCTION

Defendant Brandon Hattaway is before the court on an indictment charging him with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 924(e)(1).  See Docket No. 1.  He moves to suppress the firearms seized from his home by law enforcement and the statements made during the officers' presence in his home.  See Docket Nos. 24 and 35.  The government resists Mr. Hattaway's motion.  See Docket Nos. 28 and 36.  The district court, the Honorable Jeffrey L. Viken, Chief Judge, referred this motion to this magistrate judge for the holding of an evidentiary hearing and issuing a report and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  The following is this court's recommended disposition of the motion.

**FACTS**

An evidentiary hearing was held on Mr. Hattaway's motion on July 9, 2013.  Present at the hearing were Mr. Hattaway and his lawyer, Assistant Federal Public Defender Gary Colbath.  Present on behalf of the government was Assistant United States Attorney Wayne Venhuizen.  From the evidence introduced at the hearing, the court finds the following facts.

Mr. Hattaway lives on 10 acres of rural land near Custer, South Dakota, where he serves as a volunteer firefighter and an Emergency Medical Technician ("EMT") on the ambulance crew.  Mr. Hattaway and his wife, Brooke Hattaway, raise llamas on their land.

While serving on the ambulance crew, Mr. Hattaway became acquainted with Jacob Ehlert, who is both an EMT and a Conservation Officer for the South Dakota Department of Game, Fish and Parks.  Through the course of their acquaintance on the ambulance crew, Officer Ehlert became aware that Mr. Hattaway had previously been convicted of a felony offense.

The Hattaways began experiencing problems with mountain lions on their property.  On March 26, 2013, Mr. Hattaway called Officer Ehlert in his capacity as a conservation officer to report that a mountain lion had killed three of the Hattaways' llamas.  Mr. Hattaway told Officer Ehlert that he would have killed the lion, but he never had a clear shot.  From this statement, Officer Ehlert surmised that Mr. Hattaway may have a firearm.

Officer Ehlert told Mr. Hattaway that he could not come to his residence to investigate the llama deaths right then, but that he would come out to the Hattaway residence at a later date.  Officer Ehlert then notified the Custer County Sheriff's Office that Mr. Hattaway was a convicted felon and that Officer Ehlert believed he was in possession of a firearm.  The sheriff's office asked Officer Ehlert to coordinate with their office before paying a visit to the Hattaways.

On March 29, 2013, Officer Ehlert went to the Custer County Sheriff's Office where he met Deputy Matthew Haugen.  The two officers then traveled to the Hattaway residence at the same time, in separate vehicles.  Officer Ehlert had called Mr. Hattaway and notified him that he was coming out to investigate the llama deaths.  Nothing was said about the issue of firearms or Mr. Hattaway's felony conviction.  A third law enforcement officer, a South Dakota Highway Patrolman, was also aware of the site visit, positioning himself in his squad car a short distance away.  The patrolman was on standby in the event either Officer Ehlert or Deputy Haugen called upon him for assistance.

Upon arrival at the Hattaway residence at 11:25 a.m., the officers noted that there were two residences.  They parked their official vehicles a little distance away, not knowing which structure was the Hattaways' home. Mr. and Mrs. Hattaway met the officers in the driveway.  Prior to exiting their

vehicles, both Officer Ehlert and Deputy Haugen attempted to activate voice recording devices that each of them had secreted on their persons.

The officers greeted the Hattaways. Deputy Haugen explained his presence saying that he had business in the area, that he was a mountain lion enthusiast, and that he was "tagging along" on Officer Ehlert's lion investigation.[1] Deputy Haugen never indicated that the "other business" he had was connected in any way to the Hattaways.

Mr. Hattaway led Officer Ehlert to the location of the llama carcasses and Mrs. Hattaway and Deputy Haugen followed them, walking together. Officer Ehlert examined the carcasses, took photographs, noted some mountain lion scat nearby, and engaged in other activities connected with the mountain lion investigation. Officer Ehlert concluded his mountain lion investigation after approximately 25 to 30 minutes, after which time he walked back to his vehicle.

The Hattaways invited both Officer Ehlert and Deputy Haugen into their home for a cup of coffee. Officer Ehlert and Deputy Haugen agreed, but said they wanted to move their vehicles up to the Hattaways' house first. While

---

[1]Officer Ehlert and Deputy Haugen testified that Deputy Haugen simply told the Hattaways that he had other county business to deal with and was "tagging along" for the mountain lion investigation. Mrs. Hattaway testified that Deputy Haugen also added the comment that he was a mountain lion enthusiast. All three witnesses agreed that the Hattaways were never told that Deputy Haugen's "other business" had anything to do with the Hattaways. The court finds credible Mrs. Hattaway's testimony that Deputy Haugen embellished his story by saying he was a "mountain lion" enthusiast.

moving his vehicle, Officer Ehlert checked his voice-activated recording device, discovered it had not been working so far, and restarted it.  Thus, from the time Officer Ehlert entered the Hattaways' home, the conversation which took place near Officer Ehlert was recorded.  A disc of the audio recording was admitted into evidence at the hearing in this matter as Exhibit No. 1.

For the first several minutes after the two officers entered the Hattaway home, the conversation consisted of small talk.  Deputy Haugen then broached the subject of the real reason for his attendance at the Hattaway home:

> Deputy Haugen:  You let me hang around for your llama thing.  If you don't mind, I just have a pretty brief thing, but it's, it's important, so I gotta, I gotta check in with you about it.  It's, it's not a real big deal, I think it's something we can figure out.  But we, the county, we . . . all the firearms purchases go through our office.  We got a record of a recent firearms purchase around here.  And so we just gotta make sure that there's not a firearm in the house.  I know they're really handy for shootin' mountain lions, but with, with your record, you can't have one in the house, by law.[2]  And so that's what I'm here to check out.  Find what's goin' on with that.

Deputy Haugen acknowledged that the statement he made that his office receives records of firearms purchases and that there had been a record of a

---

[2]Defense counsel asserts that this was a misstatement of the law by Deputy Haugen.  This court expresses no opinion on whether Deputy Haugen properly stated the law, but entrusts the resolution of this issue to the district court and the jury.

recent purchase by the Hattaways was a lie. He stated that he told the

Hattaways this lie in order to make things "go smoother."

Upon making this statement, Deputy Haugen testified that Mr. Hattaway

became visibly upset and tearful. Mrs. Hattaway testified that she was

"shocked" by this change in conversation. Deputy Haugen then continued:

> Deputy Haugen: I see you're keeping a nice straight face. An' I mean, I'm not here to bust your balls or give everyone a bad time. But even if it's, even if it's not yours. . .
>
> Mr. Hattaway: According to my understanding, as long as it's got a trigger lock on it and I do not have access to it . . . and it's in a locked box, . . .
>
> Deputy Haugen: What I have to do, is I have to collect it and put it in our office for safekeeping and let somebody smarter than me who's expert on the law figure that out. And so me securing a firearm doesn't, doesn't mean it's gone forever. It doesn't mean that. But that's my job. And I feel kinda, kinda uncomfortable because we've been havin' a great time and you offered me coffee, but that's what I have to do, and . . .
>
> Mrs. Hattaway: So I can't own firearms?
>
> Deputy Haugen: It's my understanding of the law, and that's why what we're gonna have to do is let somebody. . . I'll have to make a report, and then the state's attorney's office–'cause they're actual lawyers [indistinct muttering]–but my understanding of the law is that even, um, with your record, you can't have access or control of or possession of. And if you're in the same house . . .

| | |
|---|---|
| Mr. Hattaway: | No, I was, when I was on parole, my wife, . . . my parole officer said, as long as I did not, as long as it was in a locked box I did not have access to . . . |
| Deputy Haugen: | In South Dakota? |
| Mr. Hattaway: | In South Dakota. |
| Deputy Haugen: | Who was, who was it? |
| Mrs. Hattaway: | No. |
| Mr. Hattaway: | No, Wyoming. |
| Mrs. Hattaway: | It was Wyoming. |
| Deputy Haugen: | Here in South Dakota, they're pretty clear on that. And, and you know, I'm the last guy in the world that wants to create more unarmed people, especially if you live in critter country. But my job is clear. That's what I gotta do. And what I'd appreciate it, if you'd just work with me and trust me, I can give you, I made a fancy receipt, so it's not, you don't have to worry that it's gonna accidentally disappear. |
| Mrs. Hattaway: | Ok. Now I did call ATF [the Bureau of Alcohol, Tobacco, and Firearms] a while ago about, 'cause I wanna know if Brandon can hunt. And they said that he could hunt with black powder and bow. . . .and, um, but I don't know. . .I'm sure it would . . . I don't, I don't understand all that on, you know, . . . |
| Deputy Haugen: | The ATF doesn't consider a black powder weapon a firearm they way they do a cartridge-firing weapon. It's, it's a whole different thing. It gets complicated. But it's, if you have a . . . what have you got here, what is it, for a firearm? We just have a record of a transaction. I don't know what it is. |

7

| Mr. Hattaway: | I'm really torn. |
|---|---|
| Deputy Haugen: | Well, I know that you are.  But as you know--you work with cops, you're a first responder . . . |

[Both talking over the top of each other]

| Mr. Hattaway: | I've put a lot into my community.  And I'm torn between giving you the answer I know you want and the answer I want to give you. |
|---|---|
| Deputy Haugen: | And I respect that.  And just let me just tell ya, let me just tell ya that I talked to our state's attorney about this, 'cause that's who the weight's gonna be on, and he told me . . . I told him that, I don't know . . . |

At this point, the discussion between Deputy Haugen and Mr. and Mrs. Hattaway was interrupted by a delivery of some boots which was made to the Hattaway house.  Following the interruption, Mr. Hattaway said:

| Mr. Hattaway: | I'll just shoot straight with ya.  I've got multiple firearms.  I don't pack 'em.  I don't . . . |
|---|---|
| Deputy Haugen: | Well I really appreciate you doin' the easy, straight-up thing.  'Cause that's what I told our state's attorney.  You're a first responder, you're gonna work with me.  You're not gonna turn this into something it doesn't need to be. |
| Officer Ehlert: | Brandon, you're a straight-up guy and I can vouch for ya. |

At this point in the conversation, Mr. Hattaway walked over to some kitchen cabinets that formed a wall between the kitchen and the entry area that Officer Ehlert and Deputy Haugen had entered the house through.  From on top of the cabinets, he brought down a .22 rifle and a 12-gauge shot gun

and handed them to Deputy Haugen.  The weapons were high enough up and protected from line of sight by the cabinets that they were not in plain view of the officers.

After Mr. Hattaway handed Deputy Haugen the two weapons, Deputy Haugen asked, "Is that all ya got?"  In response, Mr. Hattaway asked, "I'm not goin' to jail, right?"  Deputy Haugen assured him, "I'm not here to arrest ya. Let me tell ya how this shakes out.  I make a report.  The state's attorney reviews it, and . . ."

Mr. Hattaway said, "No.  'Cause, I mean . . .  Let, let's stop for a second. 'Cause I'm lookin' at five years, I mean it's federal.  Possession of a firearm, if it's on me.  It's not."

At this point Mrs. Hattaway reentered the room after dealing with the delivery man and asked "What'd I miss?"  Deputy Haugen told her that her husband had given him the shotgun and the .22 rifle.

Deputy Haugen then asked Mr. Hattaway, "So you said you had multiple, how many others are there?"

When Mr. Hattaway did not immediately volunteer anything more, Officer Ehlert said, "Brandon, I know you've got a handgun 'cause I saw a casing out on the deck.  Where's the handgun at?"  In response, both Mr. and Mrs. Hattaway began walking down a hallway to their bedroom.

9

Officer Ehlert left the Hattaway residence at this point to place the .22 rifle and the shotgun in his vehicle. He called the Highway Patrolman that was standing by and asked him to come to the Hattaway residence. The patrolman then came to the driveway of the residence in his patrol vehicle. The recording device was on Officer Ehlert's person, so the conversation between the Hattaways and Deputy Haugen that occurred while Officer Ehlert was outside securing the first two weapons was not recorded.

While Officer Ehlert was outside, the Hattaways and Deputy Haugen entered the master bedroom. Mr. Hattaway picked up an AR15 rifle that had been standing near the bed, discharged a bullet that had been chambered in the rifle, and then handed the rifle to Deputy Haugen. Then Mr. Hattaway opened a drawer to a bedside table and retrieved a box that was locked with a combination key-pad lock. Mr. Hattaway opened the box and handed Deputy Haugen a Smith and Wesson semi-automatic pistol. From the adjoining master bathroom, Mrs. Hattaway retrieved a rifle case and gave it to Deputy Haugen. In total, the Hattaways turned over to Haugen and Officer Ehlert one pistol, four rifles, and one shotgun.

Officer Ehlert re-entered the master bedroom while the transfer of guns was in progress. Then the two officers, followed by the Hattaways, went out to Deputy Haugen's vehicle in the driveway to inventory the guns and fill out receipts for the guns being seized. While standing in the driveway,

Mrs. Hattaway asked Ehlert whether her husband was going to be in trouble. Officer Ehlert told Mrs. Hattaway the bald-faced lie that he had been completely surprised by Deputy Haugen's firearms investigation. Officer Ehlert told Mrs. Hattaway that he had had no prior idea that Deputy Haugen was going to conduct any type of firearms investigation.

Officer Ehlert then told Mrs. Hattaway, "I think, that given Brandon's status in the community, and given that a lot of people think pretty highly of him, I think if you guys cooperate with everything, it's are gonna go way, way better for ya."

The conversation continued:

| | |
|---|---|
| Mrs. Hattaway: | Well, I'm not gonna argue with anything, but, I mean, these are all my guns. I purchased every one of them. Brandon hasn't. And I have cases, I have locked cases for every single one of them. 'Cause that was my impression of the law, was that I could have these guns, as long as they were under a lock and key. My pistol was in a security lock box. My keys are on my key ring for those cases. |
| Officer Ehlert | No, I understand that. And I'm just asking you to be here to help them. |

Deputy Haugen then asked Mr. Hattaway to stand by while Deputy Haugen wrote receipts for the guns that he was seizing to make sure they were correctly identified. Mr. Hattaway told Deputy Haugen that he should have Mrs. Hattaway, not him, stand by as all the guns belonged to her.

Mrs. Hattaway then oversaw Deputy Haugen's writing out of the receipts for the guns seized.

Mrs. Hattaway, Mr. Hattaway and Officer Ehlert then engaged in small talk. Without prompting and completely unrelated to any conversation that was occurring, Mr. Hattaway spoke up.

> Mr. Hattaway: You ever have a life event epiphany? . . . I'm standing here right now, and it's like an out-of-body experience. I'm lookin' at this and thinkin' you know what? Five years ago I woulda told ya "what're you talking about? There's my driveway, you can go ahead and leave." Well, I'm not that person . . . "

Deputy Haugen responded that he would work with Mr. Hattaway as much as he could. He assured Mr. Hattaway that Hattaway's cooperation went a long way toward "takin' a lot of the pain out of this."

Officer Ehlert shadowed Mr. Hattaway whenever he moved about. Officer Ehlert's conduct was so overt that Mr. Hattaway commented on it at one point and asked Officer Ehlert if he was following him. Officer Ehlert explained "it's just my training."

At one point during the encounter with law enforcement, Mrs. Hattaway inquired whether she could transfer the firearms to her father as an alternative to Deputy Haugen seizing the guns. Deputy Haugen said that might be a later, more long-term option, but that for that day, Deputy Haugen was required to take control of the guns.

Later in the conversation, Mr. Hattaway told Deputy Haugen that he knew Deputy Haugen was just doing his job. Mr. Hattaway then said, "We knew that when we bought weapons that, that was a chance. But, like I said, we, we . . . everything I've ever been told has said as long as I'm not carrying . . ."

Officer Ehlert chimed in and said, "You believe that what you're doing is right." "Right," responded Mr. Hattaway. Mr. Hattaway then went on to explain that the shotgun was out of reach of the kids near the door, but that they had had a mountain lion on the deck just outside their door a year ago, and the lion was in the process of opening the sliding glass door. Mr. Hattaway explained that he took a shot at the cougar with a pistol, but only injured the cat, did not kill it. When he subsequently called South Dakota Game, Fish & Parks to report the lion, no officer would even come to the Hattaway residence to investigate. Deputy Haugen then announced to both the Hattaways:

> Deputy Haugen:  All we gotta' do now, and I apologize, 'cause this seems intrusive and rude--like I haven't been rude until now, right? But we're just gonna' make a quick sweep through the house, we're not tearin' it apart, [inaudible] we're just gonna' check to make sure we didn't miss any.
>
> Mrs. Hattaway:  You didn't.
>
> Mr. Hattaway:  The only thing left in there is ammo.

Deputy Haugen then told the Hattaways that he was going to inform the South Dakota Highway Patrol Trooper who was standing by that Deputy

Haugen and Officer Ehlert were going to search the house again. Deputy Haugen told the Hattaways that they could just "hang out here with the Trooper" in the driveway while he and Officer Ehlert re-entered the house. Mr. Hattaway then attempted to make light of the situation by asking, "Oh, did you grab the bazooka from under the bed?" Mrs. Hattaway and Officer Ehlert both laughed. Officer Ehlert then responded by telling a joke of his own from a situation he was in during his law enforcement training.

Mr. Hattaway then walked into his house, saying "I got a few more ARs I need to give you." He then produced a toy gun. Officer Ehlert laughed. The parties then continued to make small talk for a period of time after this. Mr. Hattaway stated to the officers that he had considered only turning over the .22 rifle to the officers when they first asked about guns. The officers assured Mr. Hattaway that things would go better for him because he had cooperated fully with their questions and search. Deputy Haugen and Officer Ehlert found no additional firearms during their second sweep of the house. Deputy Haugen and Officer Ehlert left at 1:15 p.m.

Mr. Hattaway was not arrested that day. At no time during the day on March 29, 2013, did either Deputy Haugen or Officer Ehlert ever raise their voices, swear, threaten, or physically touch or intimidate Mr. or Mrs. Hattaway. At no time were Mr. or Mrs. Hattaway physically restrained. Mr. Hattaway appeared entirely normal and sober at all times on this day. Neither Deputy

Haugen nor Officer Ehlert ever told the Hattaways that they did not have to allow the officers into their home, neither officer told the Hattaways that they did not have to consent to the officers search of their home, neither officer told the Hattaways until late in the encounter that Mr. Hattaway was not going to be arrested that day, and at no time did either officer give the Hattaways Griffin[3] warnings or advise them of their Miranda[4] rights. Neither of the Hattaways ever told the officers to stop, to leave their home, nor did they attempt to limit the officers' entry to their home. None of the guns or ammunition seized by Deputy Haugen on March 29, 2013, was in plain view inside the home. No gun cases were in plain view inside the home. The only evidence of firearms were some bullet casings observed by the officers outside the home.

---

[3]United States v. Griffin, 922 F.2d 1343 (8th Cir. 1990). Griffin warnings are the statements to a suspect that he is not under arrest, that he will not be arrested that day, that the suspect does not have to speak to his interrogators, that the suspect may leave, that the suspect is free to refuse to answer any particular question if he does choose to talk to interrogators, and that the suspect is free to end the interrogation and leave at any time even if he agrees initially to talk to the interrogators. Id. at 1349-50. Law enforcement officers often give these warnings in non-custodial interrogations to ensure that the suspect is not considered to be in custody and thus require Miranda warnings.

[4]Miranda v. Arizona, 384 U.S. 436 (1966). Miranda warnings are required before police engage in custodial interrogation. Id. at 444. The warnings consist of telling the person that they have a right to remain silent, that any statement they make can be used as evidence against them at trial, that they have a right to have an attorney present during questioning, and that they have a right to have the court appoint an attorney for them if they cannot afford to hire one. Id. Here, no one disputes that Mr. Hattaway was never in custody, so Miranda warnings were never required.

The court takes judicial notice of Mr. Hattaway's criminal history, which was provided to all parties at Mr. Hattaway's initial appearance. He was convicted of misdemeanor assault and damage to property at age 16. At age 18 he was convicted of aggravated robbery and sentenced to a penitentiary term of 1 to 15 years. He served just over four years of that sentence before being paroled. He was re-incarcerated for approximately 3 weeks for a parole violation, then served out the rest of his parole without incident until his discharge from parole at approximately age 27. He was convicted of a misdemeanor charge of damage to the jail at age 19, misdemeanor receiving stolen property at age 25, two speeding tickets and one ticket for having inoperable taillights on an automobile, the latter three traffic offenses all being within the last two years.

Mr. Hattaway now moves to suppress the firearms seized from his home. In support of his motion, Mr. Hattaway argues that the officers' search of his home was in violation of Mr. Hattaway's Fourth Amendment right to be free from unreasonable searches and seizures. Mr. Hattaway argues that the search was not supported by a valid search warrant, by valid consent, nor by any judicially-recognized exception to the warrant requirement. At the close of the evidentiary hearing, defense counsel requested leave to file a supplemental brief on the suppression of Mr. Hattaways statements. This court permitted supplemental briefing by the parties. See Docket Nos. 35 and 36.

**DISCUSSION**

**A.    Suppression of the Physical Evidence Seized from the Home**

**1.    The Law on Voluntariness of Consent**

"Absent a valid exception to the warrant requirement, a warrantless search of a person's home presumptively violates the Fourth Amendment." United States v. Mendoza, 677 F.3d 822, 829 (8th Cir. 2012) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)).  The home is at the very center of the privacy protections encompassed by the Fourth Amendment. Payton v. New York, 445 U.S. 573, 585-86 (1980).  Both parties agree that neither Deputy Haugen nor Officer Ehlert had a search warrant.  The police may search a person's home without a warrant if that person gives voluntary consent.  Mendoza, 677 F.3d at 829 (citing Schneckloth, 412 U.S. at 222).  The government asserts that Mr. and Mrs. Hattaway consented to the search of their home.

A consent to search is valid if the "totality of the circumstances demonstrates that the consent was voluntary."  United States v. Chaidez, 906 F.2d 377, 380 (8th Cir. 1990).  Consent is voluntary if it was given as a result of the free and unconstrained choice of its maker, without coercion, express or implied.  Schneckloth, 412 U.S. at 227.  The Government must prove voluntariness by a preponderance of the evidence.  Chaidez, 906 F.2d at 380. The appropriate inquiry as to voluntariness is not whether the defendant actually consented, but rather whether a reasonable person would have

believed that the subject of the search gave voluntary and knowing consent. United States v. Escobar, 389 F.3d 781, 785 (8th Cir. 2004) (citing United States v. Cedano-Medina, 366 F.3d 682, 684 (8th Cir. 2004)).

The totality of the circumstances which should be considered include "both the characteristics of the accused and the details of the interrogation." Chaidez, 906 F.2d at 380-81. Among the characteristics of the accused which should be considered are: (1) his age; (2) his general intelligence and education; (3) whether he is intoxicated or under the influence of drugs when consenting; (4) whether he had been informed of his Miranda rights when consenting; and (5) his previous experience with the criminal justice system. Id. at 381 (internal citations omitted). Among the circumstances of the interrogation environment which should be considered are: (1) whether the interrogation was lengthy; (2) whether the suspect was threatened or physically intimidated; (3) whether the suspect relied on any promises or misrepresentations by law enforcement officers; (4) whether the suspect was in custody or under arrest when consent was given; (5) whether the suspect was in a private or secluded place when consent was given; and (6) whether he objected or stood silently by while the search occurred. Id. (internal citations omitted).

Courts are also to consider "whether the defendant's contemporaneous reaction to the search was consistent with consent." Escobar, 389 F.3d at 785

(quoting United States v. Jones, 254 F.3d 692, 696 (8th Cir. 2001)).  The listed

factors are not to be applied mechanically, and no single factor is dispositive.

Id. (citing United States v. Bradley, 234 F.3d 363, 366 (8th Cir. 2000)).

The fact that the suspect was not informed that he had a right to refuse

consent for the search does not defeat a showing that otherwise supports a

finding of voluntary consent.  See Schneckloth, 412 U.S. at 231-233.  However,

if an officer does inform the suspect that he is free to withhold his consent, this

lessens the probability that consent was the result of coercion.  United States

v. Mendenhall, 446 U.S. 544, 558-59 (1980).  Whether consent was knowing

and voluntary is a question of fact.  Schneckloth, 412 U.S. at 248-49.

Mr. Hattaway relies on Bumper v. North Carolina, 391 U.S. 543 (1968) in

support of his argument on suppression.  Mr. Hattaway argues that he never

gave voluntary consent to search but merely acquiesced to a claim of lawful

authority.

In the Bumper case, four Caucasian police officers went to the home of a

66-year old African-American woman who lived in a rural area at the end of an

isolated mile-long dirt road.  Id. at 546.  The woman was alone but for some

young children.  Id.  One of the officers announced "I have a search warrant to

search your house."[5]  Id.  The woman then replied "go ahead" and opened the

_____

[5] The searching officers did have a warrant, but one was never returned.
The prosecutor relied on consent rather than the warrant.  See Bumper, 391
U.S. at 548, 550 n.15.

19

door.  Id.  The officers then seized some evidence related to a crime they believed the woman's grandson, who lived with her, had committed.  Id.

At the suppression hearing in her grandson's criminal case, the woman testified that she "was satisfied" that the officers had lawful authority to search her home, which she did not question or object to.  Id. at 546-47.  The sole basis for the woman's agreeing to allow the officers into her home to search was their representation that they had a search warrant.  Id.  The government relied exclusively upon the woman's consent to search, not any search warrant, as the justification for the search.  Id. at 548.

The Court held that the prosecution could not sustain its burden to prove free and voluntary consent to search had been given by merely showing "acquiescence to a claim of lawful authority."  Id. at 548-49.  The Court went on to say that "[w]hen a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search.  The situation is instinct with coercion–albeit colorably lawful coercion.  Where there is coercion there cannot be consent."  Id. at 550.  The Court held that the facts did not support the conclusion that the woman had given free and voluntary consent to search.  Id. at 550-51.

In the case of United States v. Escobar, the Eighth Circuit likewise found a suspect's statement that the police could "go ahead" and search luggage was not voluntary and knowing consent.  Escobar, 389F.3d at 786.  In that case,

police became suspicious of Escobar and his traveling companion, Loos, when they observed their luggage at a bus terminal. Id. at 783. The suspicion did not rise to the level of probable cause, so the police asked a bus company employee to page the owners of the luggage.[6] Id. Loos came to the employee counter where a police officer intercepted her and identified himself as a police officer. Id. The officer told Loos she was not under arrest, that she had done nothing wrong, but that the officer needed to talk to her. Id. The officer then lied to Loos by telling her that a drug-sniffing dog had alerted to the presence of drugs in her luggage. Id. The officer asked Loos if she had the keys to the luggage. Id.

While Loos rummaged in her purse as if looking for the keys to the luggage, police continued to question her. Id. Finally, an officer asked Loos to accompany him to the baggage area. Id. The officer turned and walked away from Loos without waiting for her to answer; Loos followed. Id. Upon arrival in the non-public baggage area, the police officer asked Loos if he could search in her purse for the keys to the luggage. Id. Loos responded by laying her purse on the table and saying, "go ahead." Id. The police never informed Loos that she was free to refuse consent to search. Id. Police conducted a warrantless search of Loos's purse and, upon finding the keys to the luggage, also searched Loos and Escobar's luggage, finding contraband. Id.

_____

[6]The parties disputed whether the officers' suspicions rose to the level of a reasonable, articulable suspicion.

The Eighth Circuit held that Loos' consent to search was not knowing and voluntary.  Id. at 786.  The fact that Loos told the officer to "go ahead" with the search was not determinative of whether Loos' consent was voluntary.  Id. From the very inception of Loos' encounter with police, when the police "represented [that] a drug-sniffing dog had alerted on the travel bags, he communicated to Loos and Escobar there was probable cause to search and they had no choice but to permit it."  Id.  Police, the court noted, are not permitted to "convey a message that compliance with their requests is required."  Id. (citing Florida v. Bostick, 501 U.S. 429, 435 (1991)).

Furthermore, the police never told Loos that she could refuse to consent to the search and they never advised the suspects of their Miranda rights.  Id. Although neither of these advisements were required in order to find that consent was voluntary, the giving of such advisements would certainly "lessen the probability that a defendant was subtly coerced."  Id. (quoting United States v. Lee, 356 F.3d 831, 834 (8th Cir. 2003)).  Given the totality of facts, the court held that Loos had merely acquiesced in the officer's request to search, believing that she had no other choice.  Id.; see also United States v. Carter, 884 F.2d 368, 374-75 (8th Cir.1989) (holding defendant's consent to search his wallet was not voluntary where, among other findings, the district court found that police misrepresented the reason why they wanted to search defendant's wallet).

In <u>Holloway v. Wolff</u>, police claimed to have a search warrant,[7] which they showed to the 15-year-old son of the homeowner, who allowed the police into the home to search. <u>Holloway v. Wolff</u>, 482 F.2d 110, 112 (8th Cir. 1973). After the search was already underway and the home "ramshackled," the police brought the homeowner to her home. <u>Id.</u> at 113-14. The homeowner had known the police sergeant all her life and told him he did not need a warrant, that she consented to the search. <u>Id.</u> at 114. The Eighth Circuit held that the homeowner's after-the-fact consent was not voluntary consent sufficient to support the search because it was given after the officers had already announced to her that they had a search warrant. <u>Id.</u> at 114-15 (noting "disclaimers [do] not enable the state to meet its burden of proving voluntary consent when the police claimed to be searching pursuant to a warrant" and discussing <u>McCreary v. Sigler</u>, 406 F.2d 1264, 1267 (8th Cir. 1969)).

Misrepresentations about an investigation can be evidence of coercion. <u>United States v. Turpin</u>, 707 F.2d 332, 334 (8th Cir. 1983). Misrepresentations can even invalidate consent to search if the person consented in reliance on the misrepresentation. <u>Id.</u> at 334-35. The presence of deception by law enforcement officers is not determinative, but only one of the factors to be considered. For example, the Supreme Court has approved consent given by a suspect to an undercover drug agent to enter the suspect's home, which

---

[7] The warrant was later found to be invalid. <u>Holloway</u>, 482 F.2d at 113.

necessarily involves deception to gain entry to the home on the part of the agent.  Lewis v. United States, 385 U.S. 206, 211 (1966).  The Court's approval was premised on the fact that the defendant had converted his home into a commercial center for the transaction of business, albeit illegal business, so that the agent's acceptance of the invitation to come within and do business was for the very purpose contemplated by the defendant.  Id.

In United States v. Briley, the defendant argued that the police obtained his girlfriend's consent to enter their joint apartment through deception because the police said only that they wanted to talk to Briley, not to arrest him, which they subsequently did when the girlfriend admitted the police to the apartment.  See United States v. Briley, 726 F.2d 1301, 1302-04  (8th Cir. 1984).  However, in that case, the girlfriend knew that the police had come to her apartment some two weeks earlier to interview Briley because he was a suspect in a bank robbery, so the reason for the officers' interest in Briley when they sought consent to enter the apartment was known to the girlfriend.  Id. at 1304-05.  Furthermore, the girlfriend initially refused to assist the police and it was only after the police had turned and begun to leave that the girlfriend called them back and told the officers that Briley was in her apartment and gave them entry to it.  Id. at 1303.  Under these facts, the court held that the officers' vagueness about why they were attempting to locate Briley did not vitiate the girlfriend's voluntary consent for them to enter her apartment.  Id. at

1304-05.  See also United States v. Yang, 345 F.3d 650, 654-55 (8th Cir. 2003)

(officer's deception about the significance of written consent form did not vitiate

the defendant's voluntary consent to search because defendant's steadfast

refusal to sign the written form was accompanied by oral consent, which

showed that defendant did not rely on the deception in granting consent);

Turpin, 707 F.2d at 334-35 (holding that officers telling suspect that they were

investigating decedent's death in a train accident was accurate and not

deceptive, even though officers did not tell the suspect that the decedent had

been killed and that they were investigating the death as a homicide).

The Briley court emphasized that its holding was a narrow one, and that

they might reach a different conclusion if the officers had affirmatively

represented to the girlfriend that they did not intend to arrest Briley, or if the

police had attempted to trick her by falsely stating their purpose, or if the facts

indicated that the girlfriend was not aware of her right to withhold consent, or

otherwise lacked the maturity, sophistication, or intelligence to give an effective

consent.  Briley, 726 F.2d at 1305 (stating:  "[t]he officers' cryptic statement

that they had important matters to discuss with Briley does not appear to have

been said with the intention of tricking [his girlfriend] into consenting to an

entry . . . .  The officers had a right to go about their duties 'without

gratuitously advertising [their] every move to anyone they might encounter"  Id.

at 1304-05 (internal citation omitted)).

## 2.    Application of the Law to the Facts Herein

Applying the above law to the facts of this case presents a close question. There is no doubt that Deputy Haugen and Officer Ehlert practiced deception on Mr. Hattaway. They gained entry to the Hattaways' home under false pretenses–Deputy Haugen gave no clue to either Mr. or Mrs. Hattaway that the "other business" he had that day had anything to do with them, let alone with firearms. Mrs. Hattaway testified that she attributed Deputy Haugen's presence on her property as due to his enthusiasm for mountain lions and his desire to "tag along" with Officer Ehlert to observe his investigation. Mrs. Hattaway's invitation to the officers to enter her home for a cup of coffee would probably not have been extended if she did not believe the officers' official business at the Hattaway home was at its end. In any event, consent for a police officer to enter one's kitchen for the purpose of serving him a cup of coffee does not equal consent for that officer to search the entire house. United States v. Castellanos, 518 F.3d 965, 970 (8th Cir. 2008) (holding that Castellanos' failure to object to the officers' initial entry into his home indicated consent for the officers to enter the living room, but stating that "allowing an officer to enter one's home and allowing the officer to search the home are two very different matters. When a person permits an officer to enter the person's home, the officer does not have free reign to wander around the home and search any area of the house, without further consent.").

26

And the officers' deceptions which gained them entry into the Hattaway home continued. Once Deputy Haugen revealed what his true purpose was in coming to the Hattaway residence, he misrepresented that he already had proof of a firearms purchase by the Hattaways because–as he misrepresented–all reports of firearms purchases go through the Custer County Sheriff's Office.

Finally, Deputy Haugen repeatedly told the Hattaways–*before* either of them consented to any search, made any incriminating statements, or "voluntarily" produced any firearms–that he, Deputy Haugen, was "required" to take the firearms he purportedly already knew were there, he "had to" take their firearms, he "gotta" take the guns, he said that it was his "job" to take their firearms, that he had to "secure" their firearms, and that any legal problems could be sorted out later by the "experts." These statements left Mr. Hattaway no option but to conclude that Deputy Haugen's taking of his guns was preordained.

Deputy Haugen compounded this misrepresentation about his legal authority by also repeatedly representing to Mr. Hattaway that he could secure favorable treatment with the local state's attorney if Mr. Hattaway cooperated with Deputy Haugen. As Deputy Haugen knew or should have known, any prosecution decisions for this federal crime would rest with the United States Attorney's Office, an office that Deputy Haugen would have had little contact and little influence with.

Like the police in Escobar, Deputy Haugen's false statement of his legal authority–that he had proof that Mr. Hattaway had a gun and that Haugen was required right then and there to collect Mr. Hattaway's guns whether Mr. Hattaway agreed or not–coerced Mr. Hattaway into turning over his firearms to Deputy Haugen.  Deputy Haugen's statements to this effect were similar to the police's deception in the Escobar case that a drug sniffing dog had alerted to Loos and Escobar's luggage.  In both cases, the effect of the misrepresentation was to induce the suspect to believe that the police already had probable cause to conduct the search, that the search was inevitable, and that the defendant's consent was really beside the point.

In analyzing the effect of Deputy Haugen's misrepresentation on Mr. Hattaway, it is important to note that neither Deputy Haugen nor Officer Ehlert ever told Mr. Hattaway that he had a right to refuse consent to search and neither advised Mr. Hattaway of his Griffin or Miranda rights.  Neither officer ever told Mr. Hattaway–prior to the seizures of the firearms--that he was not currently under arrest nor that he would not be arrested that day.[8]  While these advisements are not required, the failure to advise of these rights coupled with the representation that Deputy Haugen was "required" to take the

---

[8]In fact, when Deputy Haugen, Officer Ehlert, and the Hattaways left the home and walked out to the driveway so Deputy Haugen could inventory the guns he had seized, Mrs. Hattaway saw the state trooper that was on standby for the first time.  She immediately asked Officer Ehlert whether the trooper was there to take Mr. Hattaway into custody.

firearms vitiates the voluntariness of Mr. Hattaway's subsequent apparent consent. The court notes that the search here concerned Mr. Hattaway's home, at the very center of Fourth Amendment protections, while the place searched in Escobar was two pieces of luggage in a bus terminal.

Also significant to the court's conclusion is the fact that never, at any time, did Deputy Haugen or Officer Ehlert *ask* Mr. or Mrs. Hattaway for their consent to search. The simple asking of the question, "may we search your home?" suggests to the askee that he has the ability to say "no." The failure to even ask the question, to make seizure of the guns seem "required" and inevitable suggests the opposite–i.e. that the askee has no right to refuse.

In addition to the above, the court notes that Officer Ehlert "shadowed" Mr. Hattaway wherever he moved, a fact noted by Mr. Hattaway on the audio tape. Furthermore, when Deputy Haugen and Officer Ehlert told the Hattaways that they were going to do a sweep of the house to make sure they had not missed anything (again, the officers "told" instead of "asked"), the officers instructed the Hattaways to stay out in the driveway with the state trooper (an instruction they disregarded). While these limitations on the Hattaways' movements do not amount to the conclusion that either of them was "in custody," nevertheless they are factors under the totality of the circumstances that the court considers. And these factors cut against a finding of voluntary consent.

The government makes much of Mr. Hattaway's later statements. For example, the government emphasizes Mr. Hattaway's statement that he was "torn" about what to reveal, and his statement that five years ago, he was a different man and would have refused entry to the officers. However, the court notes that all of these statements came *after* Deputy Haugen's numerous deceptions–chiefly his deception about the nature of his presence at the home to begin with and then his deception about his legal authority. Like the homeowner in Holloway, it is not surprising that a suspect will go out of his or her way to cooperate, even to the point of obsequiousness, once law enforcement has demonstrated (falsely) that they have the upper hand under the force of the law. Holloway, 482 F.2d at 113-15. Statements made after "consent" has been given do not retroactively bolster the earlier consent and make it voluntary. Id.

The court notes that Mr. Hattaway does have some experience with the criminal justice system. However, neither party introduced evidence that Mr. Hattaway's prior criminal cases resulted in educating him about his rights under the Fourth Amendment. Furthermore, the crimes he was convicted of do not, by their very nature, appear to necessarily give rise to the presumption that there were any issues regarding search and seizure under the Fourth Amendment.

When asking for consent to search, police are not permitted to "convey a message that compliance with their requests is required." Escobar, 389 F.3d at 786 (quoting Bostick, 501 U.S. at 435). And while deception alone cannot vitiate consent, if the suspect relied upon the deception in granting consent, misrepresentations can be fatal. Here, the court considers the totality of circumstances and concludes that a close question is presented. However, the officers' deceptions, coupled with Mr. Hattaway's reliance on the deceptions, added to the officers' failure to actually *ask* for consent, together with the officers' failure to tell Mr. Hattaway that he could refuse consent to search, lead this court to conclude that Mr. Hattaway did not voluntarily consent to the search of his home and the seizure of his guns. Rather, he merely acquiesced to Deputy Haugen's show of apparent legal authority to search. Accordingly, the court recommends that Mr. Hattaway's motion to suppress the physical evidence seized from his home be granted.[9]

---

[9] At the evidentiary hearing both Officer Ehlert and Deputy Haugen testified they had concerns relating to officer safety at various points throughout their visit to the Hattaway home. The government never formally raised this argument as a justification for a warrantless search. This court would be unlikely to adopt this argument due to the interactions depicted in Exhibit 1 and the testimony by Officer Ehlert and Deputy Haugen at the evidentiary hearing. Specifically, although Officer Ehlert testified that he was concerned for officer safety because the officers were not controlling the guns, he nevertheless left Deputy Haugen alone in the home, knowing that there were other guns therein, while he went outside to store the first two firearms in his vehicle.

**B.      Mr. Hattaway's Statements**

In addition to moving to suppress the firearms seized from his home, Mr. Hattaway also asks the court to suppress the statements he made while the encounter with the officers took place.  He asserts two arguments in support of suppression of his statements:  (1) he argues that his statements were coerced and (2) he argues that his statements should be suppressed as fruit of the poisonous tree of the Fourth Amendment violation.

**1.      Whether Mr. Hattaway's Statements Were Voluntary**

The Supreme Court has stated that, under the Due Process Clause of the Fifth and Fourteenth Amendments, "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned." Miller v. Fenton, 474 U.S. 104, 109 (1985).  "In considering whether a confession was voluntary, the determinative question is whether the confession was extracted by threats, violence, or promises (express or implied), such that the defendant's will was overborne and his or her capacity for self-determination was critically impaired."  United States v. Pierce, 152 F.3d 808, 812 (8th Cir. 1998).  The court must look to the totality of the circumstances, "including the conduct of the law enforcement officials and the defendant's capacity to resist any pressure."  Id.  See also Withrow v. Williams, 507 U.S. 680, 688-89 (1993) (continuing to adhere to the totality of circumstances test). The burden of demonstrating that a defendant's statement was voluntary rests

with the government, which must prove voluntariness by at least a preponderance of the evidence. <u>Missouri v. Seibert</u>, 542 U.S. 600, 608 n.1 (2004).

The Supreme Court has made clear that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." [10] <u>Colorado v. Connelly</u>, 479 U.S. 157, 167 (1986). That is because a *prima facie* showing of a due process violation must include a showing of some sort of *state action*. <u>Id.</u> at 165. Therefore, a defendant's mental status alone can never result in a finding that his statement was involuntary without some form of police overreaching. <u>Id.</u>

However, this does not mean that a defendant's mental status is irrelevant to the question of whether his statement was voluntary. A defendant's mental status is still relevant under the totality of circumstances test to the extent the evidence shows that the police were aware of that mental status and acted in some way to exploit it. <u>See</u> <u>Blackburn v. Alabama</u>, 361 U.S. 199, 207-08 (1960) (defendant's statement involuntary where police were aware of defendant's history of mental problems, knew that he was "probably

---

[10] "Although <u>Connelly</u> arose under the Due Process Clause of the Fourteenth Amendment, whereas the instant case appears to implicate the Fifth Amendment, the analysis in the <u>Connelly</u> decision has been extended to apply to involuntary confession claims arising under the Fifth Amendment as well." <u>United States v. Bad Hand</u>, 926 F.Supp. 892, 899n.10 (D.S.D. 1996).

insane," and proceeded with interrogation); <u>United States v. Makes Room For Them</u>, 49 F.3d 410, 415 (8th Cir. 1995) (holding that totality of circumstances requires consideration of defendant's age, education, and experience insofar as police knew those facts).  Where a defendant suffered from some mental infirmity and police were unaware of that infirmity, courts have found the necessary state action to be missing.  <u>Connelly</u>, 479 U.S. at 164-65; <u>United States v. Rohrbach</u>, 813 F.2d 142, 144-45 (8th Cir. 1987).

     The existing precedent outlines the type of police conduct that courts have found to be coercive.  The conduct includes extreme duration and conditions of detention, the manifest attitude of police toward the defendant, pressures which sap or sustain a defendant's powers of resistance or self-control, and exploiting a defendant's mental and physical state.  <u>See</u> <u>Colorado v. Spring</u>, 479 U.S. 564, 574 (1987); <u>Davis v. North Carolina</u>, 384 U.S. 737, 739-53 (1966) (defendant held for 16 days of incommunicado interrogation in a closed cell without windows); <u>Reck v. Pate</u>, 367 U.S. 433, 436-44 (1961) (defendant held for four days with inadequate food and medical attention until confession obtained); <u>Culombe v. Connecticut</u>, 367 U.S. 568, 569-70, 621-25 (1961) (defendant held for five days of repeated questioning during which police employed coercive tactics); <u>Payne v. Arkansas</u>, 356 U.S. 560, 561-68 (1958) (defendant held incommunicado for three days with little food and threats that a lynch mob would be admitted into the jail); <u>Ashcraft v. Tennessee</u>, 322 U.S.

143, 153-55 (1944) (defendant questioned by relays of officers for 36 hours without sleep).  It is this body of law which the court applies to Mr. Hattaway's assertion that his statement was involuntary.

Based on the legal analysis of <u>Connelly</u> and its progeny, the court considers all the facts and circumstances surrounding Mr. Hattaway's statements in determining whether those statements were voluntary.  <u>Withrow</u>, 507 U.S. at 688-689; <u>Arizona v. Fulminante</u>, 499 U.S. 279, 285-86 (1991); and <u>Miller v. Fenton</u>, 474 U.S. 104, 109-12 (1985).  In this context, the court also considers Mr. Hattaway's personal characteristics to the extent they were known to Deputy Haugen and Officer Ehlert.  <u>Makes Room For Them</u>, 49 F.3d at 415; <u>Jenner v. Smith</u>, 982 F.2d 329, 333 (8th Cir. 1993); <u>Blackburn</u>, 361 U.S. at 207-08.  The court concludes that Mr. Hattaway's statements were voluntary.

No evidence of any kind was introduced to support the assertion or conclusion that there was anything out of the ordinary as to Mr. Hattaway's state of mind or mental status.  He appeared completely sober and of competent mental status during the officers' stay at the house.  Mr. Hattaway was never arrested or in custody during the encounter.  Although Mr. Hattaway was without benefit of <u>Miranda</u> warnings, the warnings were not required because he was not in custody.  Furthermore, the length of the entire time the officers were at the Hattaway residence–approximately one hour and forty-five

minutes–was not exceptional or excessive.  The active period of interrogation was only approximately one hour fifteen minutes.  Mr. Hattaway was not held incommunicado away from people who could provide support to him.  He was questioned in his own home with his wife beside him.  There is no evidence that the officers deprived Mr. Hattaway of access to needed food, water, restroom facilities, or medical attention during this period.

As the court has already found under the above Fourth Amendment analysis, the officers did engage in deception and that did result in coercion.  But the aim of that coercion was to produce action on the part of Mr. Hattaway–to induce him to turn over his guns.  The coercion indeed produced this effect.

However, the coercion was not in the form of interrogation.  Most of Mr. Hattaway's statements were made extemporaneously, without prompting from either Officer Ehlert or Deputy Haugen.  For example, the officers did not quiz Mr. Hattaway about the ownership of the various guns he turned over to them; did not ask whether the guns belonged to him, his wife, or some third party; and did not inquire as to the dates on which the guns came into the Hattaways' possession.  The only direct questions posed by either officer to Mr. Hattaway about the guns was when Officer Ehlert said he had seen handgun casings outside the home and knew that Mr. Hattaway had a handgun and when Deputy Haugen said we know there has been a firearms

purchase, but we do not know what kind. Even so, Mr. Hattaway did not respond verbally to either of these direct questions, but rather he simply retrieved the gun in question and turned it over to the officers.

So, although there was some element of coercion, the court concludes that the coercion did not cause Mr. Hattaway to make the statements he made. Additionally, the court notes that neither officer issued any threats, engaged in any type intimidation (physical or otherwise), or any other behavior that could potentially wring from Mr. Hattaway his statements.

Deputy Haugen did repeatedly tell Mr. Hattaway that he would be making a report to the state's attorney and that he would tell the attorney that Mr. Hattaway had cooperated. This was not an explicit promise of lenient treatment in return for Mr. Hattaway's cooperation, but Deputy Haugen clearly intended that Mr. Hattaway draw that conclusion. But again, the aim of the veiled promise was to prompt Mr. Hattaway to turn over his guns, not to prompt Mr. Hattaway into making incriminating statements.

Although the conclusion may seem anomalous at first blush, the court concludes that though Mr. Hattaway's consent to search was coerced, his statements were not coerced. Accordingly, the court does not recommend suppressing Mr. Hattaway's statements on the grounds that they were involuntary.

### 2. Fruit of the Poisonous Tree

The second ground urged by Mr. Hattaway in support of his motion to suppress his statements is that his statements were fruit of the illegal Fourth Amendment search. When a defendant is the subject of an unconstitutional search or seizure, the exclusionary rule extends not only to the direct products of the illegal search, but also to the indirect products–the fruit of the poisonous tree–of the invasion. Wong Sun v. United States, 371 U.S. 471, 484 (1963). When there has been a Fourth Amendment violation and then a statement is obtained voluntarily and with proper advisement of rights and waiver of those rights, the primary factor to consider in determining whether the subsequent statement is "fruit of the poisonous tree" is whether, despite the illegality, the statement was the product of a clear act of free will on the part of the defendant. Id. at 486. This is because "verbal evidence which derives so immediately from an unlawful entry . . . is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion." Id. at 485. The fact that a Miranda warning was given and a waiver obtained in between an illegal seizure and a legal statement does not alone purge the taint of the initial illegality. Brown v. Illinois, 422 U.S. 590, 601-603 (1975).

Whether the subsequent statement was the product of a clear act of free will depends on whether a sufficient lapse in time has occurred between the illegality and the statement sufficient to have purged the primary taint of the illegality, whether there has been a change in place from the illegality to the place of the statement, whether there has been a change in identity of the interrogators, as well as the purpose and flagrancy of the government's misconduct in the initial illegality.  Oregon v. Elstad, 470 U.S. 298, 310 (1985); Taylor v. Alabama, 457 U.S. 687, 690 (1982); Brown, 422 U.S. at 603-604.

In the Wong Sun case, officers burst into a bedroom illegally and unlawfully arrested and handcuffed Mr. Toy, an occupant of the bedroom. Wong Sun, 371 U.S. at 486.  Mr. Toy's statements made during this interlude were held by the Court to be fruit of the Fourth Amendment violation and, thus, were suppressed.  Id.

The Court reached a different conclusion as to the statements of another co-defendant, Mr. Wong Sun.  Id. at 491.  Mr. Wong Sun had also been arrested unlawfully; but then he had an arraignment in court and was released on bond.  Id.  After his release on bond, he returned to the police station voluntarily several days later and made a statement to police.  Id.  The Court held that this statement by Mr. Wong Sun should not be suppressed because the "connection between the [illegal] arrest and the statement had 'become so

attenuated as to dissipate the taint [of the initial illegality].' " Id. (quoting

Nardone v. United States, 308 U.S. 338, 341 (1939)).

Here, there was no separation in time, place, or identity of interrogators between the initial Fourth Amendment violation and Mr. Hattaway's statements.  The statements were made even as the Fourth Amendment violation took place.  The interrogators were the same officers who were perpetrating the Fourth Amendment violation.  And there was no intervening advisement of rights under Miranda or Griffin.  Under these circumstances, the court concludes that Mr. Hattaway's statements must be suppressed as fruit of the Fourth Amendment violation.  Wong Sun, 371 U.S. at 486; cf. United States v. Yousif, 308 F.3d 820, 831 (8th Cir. 2002) (defendant's consent did not purge the taint of the Fourth Amendment violation where consent was given close on the heels of the Fourth Amendment violation to the same officer who perpetuated the unconstitutional seizure in the same location).

## CONCLUSION

Based on the foregoing findings of fact and legal analysis, this court respectfully recommends granting Brandon Hattaway's motion to suppress the physical evidence seized at his home on March 29, 2013, as well as his statements made on that same day. [Docket Nos. 24 and 35].

## NOTICE OF RIGHT TO APPEAL

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1)(B),

unless an extension of time for good cause is obtained.  <u>See</u> Fed. R. Crim. P. 59(b); 28 U.S.C. § 636(b)(1)(B).  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  <u>Id.</u>  Objections must be timely and specific in order to require *de novo* review by the district court.  <u>See</u> <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990); <u>Nash v. Black</u>, 781 F.2d 665 (8th Cir. 1986).

Dated July 18, 2013.

BY THE COURT:

/s/ *Veronica L. Duffy*

VERONICA L. DUFFY
UNITED STATES MAGISTRATE JUDGE