UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. 13-50047-JLV |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| BRANDON HATTAWAY, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ADOPTING IN PART AND MODIFYING IN PART
REPORT AND RECOMMENDATION, SUSTAINING IN PART
AND OVERRULING IN PART OBJECTIONS, AND
GRANTING MOTION TO SUPPRESS**

Before the court is a motion to suppress evidence filed by defendant Brandon Hattaway on June 11, 2013.  (Docket 24).  Mr. Hattaway seeks to suppress all evidence seized from his home by law enforcement on March 29, 2013, and all statements made by him to law enforcement during that encounter.  Id.; see also Docket 25.  The suppression motion was referred to Magistrate Judge Veronica Duffy for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and the standing order dated June 11, 2007.  A suppression hearing was held before the magistrate judge on July 9, 2013.  (Docket 37).  Magistrate Judge Duffy issued her report and recommendation on July 18, 2013.  Id.  The government filed its objections to the report and recommendation on July 30, 2013.  (Docket 38).

Under the Federal Magistrate Act, 28 U.S.C. § 636(b)(1), if a party files written objections to the magistrate judge's proposed findings and recommendations, the district court is required to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." Id.  The court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Id.

## THE GOVERNMENT'S OBJECTIONS

### FACTUAL OBJECTIONS

The government's factual objections to the report and recommendation are summarized as follows:

1. After Officer Ehlert told the defendant the officer had seen a shell casing for a handgun and asked Mr. Hattaway where the handgun was, Mrs. Hattaway immediately stated "It's mine."

2. During small talk with Mrs. Hattaway and Officer Ehlert, Mr. Hattaway made the following statement:

    > You ever have a life event epiphany? . . . I'm standing here right now, and it's like an out-of-body experience.  I'm lookin' at this and thinkin' you know what? Five years ago I woulda told ya "what're you talking about? Got a warrant? There's my driveway, you can go ahead and leave." Well, I'm not that person . . . .

3. When Deputy Haugen stated he was going to inform the state trooper who was standing by of Deputy Haugen's intention to go back inside the home and

>   "do a quick sweep," both Mr. and Mrs. Hattaway
>   stated "Okay."

(Docket 38 at pp. 5-7) (emphasis in government's objections removed).

Otherwise, the government acknowledged that "[m]ost of the facts [stated in the report and recommendation] are not in dispute." Id. at p. 2.

### **LEGAL CONCLUSIONS**

The government's objections to the magistrate judge's legal conclusions are summarized as follows:

1. The magistrate judge relied too heavily on the law enforcement officers' misrepresentations.

2. Mr. Hattaway, because of his status as a felon, knew Deputy Haugen wanted to collect any guns in the home and Mr. Hattaway knew he could require the Deputy Sheriff to obtain a search warrant instead of handing over the guns.

3. If the magistrate judge could not determine whether Deputy Haugen misstated the law concerning firearms in Mr. Hattaway's home, then Deputy Haguen's interpretation of the law cannot be considered a misrepresentation.

4. The magistrate judge improperly considered Deputy Ehlert's "bald-faced lie," as that representation occurred after the firearms had been turned over to the officers.

5. By devaluing Mr. Hattaway's conduct throughout the law enforcement encounter, failing to consider one of Mr. Hattaway's most critical statements entirely, and relying too heavily on the misrepresentations of law enforcement, the magistrate judge erred in concluding Mr. Hattaway

>   did not voluntarily consent to the search of his
>   home and the seizure of the firearms.

Id. at pp. 13-15, 17 & 19-20).

## FACTUAL DETERMINATIONS

Having reviewed suppression hearing exhibit 1—the audio recording of a substantial portion of the encounter between Mr. and Mrs. Hattaway and the law enforcement officers on March 29, 2013—the court sustains the government's factual objections and amends the report and recommendation to incorporate the following statements appearing in bold:

>   -After Officer Ehlert told the defendant that the officer had seen a shell casing for a handgun and asked Mr. Hattaway where the handgun was, **Mrs. Hattaway immediately stated "It's mine."**
>
>   -During small talk with Mrs. Hattaway and Officer Ehlert, Mr. Hattaway made the following statement:
>
>   >   You ever have a life event epiphany? . . . I'm standing here right now, and it's like an out-of-body experience. I'm lookin' at this and thinkin' you know what? Five years ago I woulda told ya "what're you talking about? **Got a warrant?** There's my driveway, you can go ahead and leave." Well, I'm not that person . . . .
>
>   -When Deputy Haugen stated he was going to inform the state trooper who was standing by of Deputy Haugen's intention to go back inside the home and "do a quick sweep," **both Mr. and Mrs. Hattaway stated "Okay."**

With these modifications, the court adopts the statement of facts in the report and recommendation and expands those facts to include the additional factual findings made in the decision portion of this order.

## DECISION

The crux of the government's legal objections is that the magistrate judge erred in concluding "the effect of the misrepresentation [by Officer Ehlert and Deputy Sheriff Haugen] was to induce the suspect [Mr. Hattaway] to believe that the police already had probable cause to conduct the search [of the Hattaway home], that the search was inevitable, and that the defendant's consent was really beside the point." (Docket 37 at p. 28). "[T]he officers' deceptions, coupled with Mr. Hattaway's reliance on the deceptions, added to the officers' failure to actually *ask* for consent, together with the officers' failure to tell Mr. Hattaway that he could refuse consent to search, lead this court to conclude that Mr. Hattaway did not voluntarily consent to the search of his home and the seizure of his guns. Rather, he merely acquiesced to Deputy Haugen's show of apparent legal authority to search. Accordingly, the court recommends that Mr. Hattaway's motion to suppress the physical evidence seized from his home be granted." Id. at p. 31 (emphasis in original).

The government acknowledges Deputy Haugen "misrepresented how he had learned about the possibility of firearms being in the home" when the officer stated "his office had a record of recent firearms purchase[s] at

5

the Hattaway residence . . . ." (Docket 38 at p. 4). Against this admission, the government asserts "Deputy Haugen never misrepresented the fact that he was investigating the Defendant for possession a firearm, nor did he misrepresent the fact that he wanted to collect any firearms that were present." Id.

Critical to the analysis is the government's admission Deputy Haugen told Mr. Hattaway "that he [Deputy Haugen] <u>had to collect the gun for safekeeping</u> . . . . [and] this <u>was part of his 'job' and something he (Deputy Haugen) had to do.</u>" Id. at pp. 4-5 (emphasis added). These statements come on the heels of Deputy Haugen's soft-sell declaration that he was investigating Mr. Hattaway's possession of a firearm but "it's not a real big deal, I think it's something we can figure out. . . . so that's what I'm here to check out. Find what's goin' on with that." (Docket 37 at p. 5). The deputy acknowledged he lied "to make things 'go smoother.' "[1] Id. at p. 6. While they discussed general policies of a felon possessing a firearm, Deputy

---

[1] The officers also made things "so smoother" by keeping a South Dakota Highway Patrol Trooper positioned in his patrol car out of sight and a short distance from the Hattaway residence. (Docket 37 at p. 3). To have exposed the trooper to Mr. Hattaway would have changed the tenor of the conversation and converted this "no big deal" into a "big deal." Later, Deputy Haugen reinforced this conclusion when he left the residence and spoke to the trooper. "He [Mr. Hattaway] doesn't know you're here, he's cooperating. You just hang outside, he likes me, he's o.k. talking to me. He's freaking out, he's crying now, we're going to get the rest of the guns then clear out." Exhibit 1 at approximately 12 minutes 20 seconds.

Haugen declared "But my job is clear.  That's what I gotta do.  And what I'd appreciate [is], if you'd just work with me and trust me, I can give you . . . a fancy receipt . . . ."  Id. at p. 7.  None of these statements of authority are true.

      First, possession of a firearm by a felon is a "big deal."  Under federal law, unlawful possession of a firearm by a felon is a felony and exposes the individual to a maximum period of incarceration of up to 10 years and a fine of up to $250,000, or both.  18 U.S.C. §§ 922(g)(1) & 924(a)(2).  Under South Dakota law, possession of a firearm by a felon who has been convicted of a violent crime[2] is a felony and subjects the individual to a maximum period of incarceration of up to two years and a fine of up to $4000, or both.  SDCL §§ 22-14-15 & 22-6-1(9).  To suggest an investigation of a felon in unlawful possession of a firearm is "no big deal" implies to anyone in Mr. Hattaway's position that there will be no consequences if he cooperates and turns over a firearm.

      Second, a law enforcement officer does not have the authority to simply enter a private residence and take possession of a firearm without either consent or a search warrant.  Deputy Haugen could conduct a residential search with either consent or a search warrant, but not simply because he perceives these activities to be a mandatory part of his job.

---

    [2]Mr. Hattaway has a prior felony for aggravated robbery.  (Docket 37 at p. 16).

Third, invoking the phrase "work with me and trust me," after describing his law enforcement functions as mandatory, implied Mr. Hattaway was obliged to let the officer perform his official duties. Again, this statement reinforces the it's "no big deal" statement analyzed above.

Fourth, coupling this mandatory law enforcement duty with the further declaration that Mr. Hattaway works with the police and is an emergency medical technician first responder suggests to Mr. Hattaway he certainly does not want to interfere with Deputy Haugen's official duties by saying "no" to a search of his home or by making the officer go to the extra work of getting a search warrant. Under the circumstances of this case, Mr. Hattaway was entitled to know both of these options. To achieve voluntary consent to search, Deputy Haugen was obligated to disclose these options before Mr. Hattaway was asked to cooperate. United States v. Mendenhall, 446 U.S. 544, 558-59 (1980) ("Although the Constitution does not require proof of knowledge of a right to refuse as the *sine qua non* of an effective consent to a search . . . such knowledge was highly relevant to the determination that there had been consent.") (internal citation and quotation marks omitted).

Rather than make these disclosures, Deputy Haugen testified, "I talked to our state's attorney about this . . . [and] I told him that [Mr. Hattaway would feel compelled to cooperate because of his service and position in the community]." (Docket 37 at p. 8). Knowing Mr. Hattaway

was conflicted because of his public service, Deputy Haugen reinforced his earlier misstatements by thanking Mr. Hattaway for allowing the officer to perform his law enforcement duties. At that point Mr. Hattaway said, "I'll just shoot straight with ya. I've got multiple firearms." Id. Deputy Haugen responded, emphasizing his earlier misstatements. "Well I really appreciate you doin' the easy straight-up thing. 'Cause that's what I told our state's attorney. You're a first responder, you're gonna work with me. You're not gonna turn this into something it doesn't need to be." Id. Officer Ehlert reinforced this duty to cooperate by stating "Brandon, you're a straight-up guy and I can vouch for ya." Id.

 After these statements, Mr. Hattaway retrieved a .22 rifle and a 12-gauge shotgun hidden from sight on top of a kitchen cabinet and handed them over to Deputy Haugen. Id. at pp. 8-9. After the firearms were handed to him, Deputy Haugen asked, "Is that all ya got?" Id. at p. 9. Mr. Hattaway inquired, "I'm not going to jail, right?" Id. In response "Deputy Haugen assured him, 'I'm not here to arrest ya. Let me tell ya how this shakes out. I make a report. The state's attorney reviews it, and . . . ." Id. At that point Mr. Hattaway cut in saying "No. 'Cause, I mean . . . let's stop for a second. 'Cause I'm lookin' at five years, I mean its federal. Possession of a firearm, if it's on me. It's not." Id. Deputy Haugen confronted him, "So you said you had multiple, how many others are there?" Id. When Mr.

9

Hattaway did not respond, Officer Ehlert stated "Brandon, I know you've got a handgun 'cause I saw a casing out on the deck. Where's the handgun at?" Id. Mrs. Hattaway immediately stated "It's mine." (Exhibit 1 at approximately 10 minutes 25 seconds).

Again, neither law enforcement officer advised Mr. Hattaway he could either consent to a search and show them where the handgun was or, based upon the probable cause they possessed given the two firearms and handgun casings on the deck, they would seek a search warrant to conduct a thorough search of the Hattaway residence. Instead, Mr. and Mrs. Hattaway acquiesced in the performance of the officers' "official duties," went to the master bedroom and produced an AR-15 rifle, ammunition and a semi-automatic pistol, together with a box with a combination key-pad lock and a gun case. (Docket 37 at p. 10).

The report and recommendation concluded "Deputy Haugen's false statement of his legal authority–that he had proof that Mr. Hattaway had a gun and that Haugen was required right then and there to collect Mr. Hattaway's guns whether Mr. Hattaway agreed or not–coerced Mr. Hattaway into turning over his firearms to Deputy Haugen. . . . the effect of the misrepresentation was to induce the suspect to believe that the police already had probable cause to conduct the search, that the search was inevitable, and that the defendant's consent was really beside the point." Id. at p. 28).

The government argues the magistrate judge's conclusion "relies too heavily on the officers' misrepresentations . . . [and] when the few misrepresentations . . . are examined under the totality of the circumstances, the incongruence between this case and cases in which individuals actually consented in reliance on a misrepresentation becomes clear." (Docket 38 at p. 13). The government claims "when the totality of the circumstances are [sic] considered, the Defendant knew Deputy Haugen wanted to collect guns in the home because of the Defendant's status as a felon, and the Defendant also knew that he could have made Deputy Haugen obtain a search warrant instead of handing over the guns." Id. at p. 14.

While the government cites a number of "withdrawal of consent" cases in support of its argument, it principally relies on United States v. Mendoza, 677 F.3d 822 (8th Cir. 2012) and asserts Mr. Hattaway voluntarily consented to the search based upon his "gestures and body language." (Docket 38 at p. 9) (citing Mendoza, 677 F.3d at 829). Because Mr. Hattaway "assisted law enforcement in the search and had a general demeanor that 'suggested consent,' " Mr. Hattaway's "words, gestures, and other conduct reveal the voluntariness of his consent." Id. at pp. 9-10 (citing United States v. Gleason, 25 F.3d 605, 607 (8th Cir. 1994)). Both Mendoza and Gleason are significantly different from the facts before the court.

In Mendoza, law enforcement stopped the defendant's vehicle and conducted a drug-dog sniff around the exterior of the vehicle. Mendoza, 677 F.3d at pp. 825-26. The officers asked the defendant to allow them to search the vehicle and to consent to a search of both his person and his vehicle. Id. at p. 826. Later the officers asked permission to search the defendant's residence and "informed Mendoza he did not have to consent to the search." Id. After discussing a consent-to-search form with the officers, the defendant indicated he would sign the form if they did not ask him any further questions. Id. Law enforcement would not add such a clause to the consent-to-search form so Mendoza did not sign it and did not verbally consent to the search of the residence. Id. When the officers announced they were going to search his home, Mendoza "gestured in the direction of the residence in a way that indicated consent and then headed to the house." Id. Once at the residence, Mendoza let the officers inside and was present throughout the search. Id. The appellate court adopted the district court's finding that "on balance, Mendoza's behavior leading up to and during the search were consistent with consent." Id. at p. 829. "The record does not indicate any use of force, coercion, intimidation or deception by the officers." Id.

In Gleason, following a traffic stop, the trooper asked Gleason "if he had any weapons in the truck and if [the trooper] could check the truck for weapons." Gleason, 25 F.3d at 606. "Gleason consented, mentioned that

12

he was a former police officer in Davenport, Iowa, and assisted in the search." Id. When additional officers later appeared on the scene, "they asked Gleason for a written consent to search." Id. After some discussion, Gleason signed the consent form. Id.

At no time did Deputy Haugen or Officer Ehlert ask Mr. Hattaway for consent or advise him of his right to refuse to allow them to search his home. (Docket 37 at pp. 28-29). Failing to ask for permission to search and failing to advise Mr. Hattaway of his right not to consent, "coupled with the representation that Deputy Haugen was 'required' to take the firearms vitiates the voluntariness of Mr. Hattaway's subsequent apparent consent." Id.

The government failed to sustain its burden to prove Mr. Hattaway freely and voluntarily consented to the search of his home by simply displaying "acquiescence to a claim of lawful authority." Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968). Deputy Haugen claimed the power to seize any firearms which may be in the Hattaway residence as a matter of lawful authority. "The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent." Id. at p. 550.

Supportive of the conclusion that Mr. Hattaway merely acquiesced to law enforcement's assertions of authority is the government's admission that when Deputy Haugen "explained his intention to go back into the

13

house and search for more weapons . . . and 'do a quick sweep,' both of the Hattaways said 'Okay.' " (Docket 38 at p. 7); see also Docket 37 at p. 14 ("Deputy Haugen told the Hattaways that they could just 'hang out here with the Trooper' in the driveway while he and Officer Ehlert re-entered the house."). Likewise, during a discussion about whether the locking gun cases should be taken by the officers, Deputy Haugen stated "We might as well take all this . . . that's associated with the guns, 'o.k.?' " and then did not wait for a response from Mr. Hattaway. Exhibit 1 at approximately 15 minutes 10 seconds.

Mr. Hattaway's subsequent "epiphany" that he could have or should have asked the officers if they had a search warrant does not convert his acquiescence to the search into voluntary consent. Holloway v. Wolff, 482 F.2d 110, 115 (8th Cir. 1973).

With the factual modifications noted above, the court finds the report and recommendation accurately sets forth the material facts and properly cites and analyzes the legal authority on the issues. The government's objections are overruled.

The government filed no objections to the findings and conclusions of the magistrate judge on the suppression issue under Wong Sun v. United States, 371 U.S. 471 (1963). See Docket 37 at pp. 38-40. Section 636(b)(1) of Title 28, United States Code, specifically requires any party objecting to the findings or conclusions of a report and recommendation of a magistrate

judge to submit their objections for district court review. The government's "failure to file any objections [on this particular issue] waived [its] right to de novo review by the district court of [that] portion of the report and recommendation of the magistrate judge as well as [its] right to appeal from the findings of fact contained therein." United States v. Rodriguez, 484 F.3d 1006, 1010-11 (8th Cir. 2007) (quoting United States v. Newton, 259 F.3d 964, 966 (8th Cir. 2001) (additional internal citation omitted).

    Having completed a *de novo* review of the audio tape of the encounter at the Hattaway residence and the audio recording of the testimony presented at the suppression hearing, the court adopts, with the minor factual additions noted, the factual findings and all of the legal conclusions of the magistrate judge. All evidence seized during the search of the Hattaway residence on March 29, 2013, is suppressed. There is no "intervening circumstance so as to remove the taint imposed upon that evidence by the original illegality [of the search of the residence]." United States v. Simpson, 439 F.3d 490, 495 (8th Cir. 2006) (internal citation omitted). The taint of the Fourth Amendment violation has not been purged and all statements made by Mr. Hattaway during the search of his residence are suppressed. Wong Sun, 371 U.S. at 488.

**ORDER**

After conducting a *de novo* review of the entire record, it is hereby

ORDERED that the report and recommendation of Magistrate Judge Duffy (Docket 37) and the factual findings and legal conclusions, except as modified herein, are adopted by the court.

IT IS FURTHER ORDERED that the government's objections (Docket 38) are sustained in part and overruled in part. The three factual objections of the government are sustained and the government's legal objections are overruled.

IT IS FURTHER ORDERED that defendant's motion to suppress (Docket 24) is granted.

IT IS FURTHER ORDERED that all physical evidence seized and all statements made by Mr. Hattaway during the search of his residence on March 29, 2013, are suppressed.

Dated January 10, 2014.

BY THE COURT:

/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
CHIEF JUDGE